**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

_____

**CARTER CASH**,

     Plaintiff,

     v.                                           Civ. No. 09-901 BB/RLP

**LOCKHEED MARTIN TRAINING
SOLUTIONS, INC.,**

     Defendant.

**MEMORANDUM OPINION AND ORDER**

This matter comes before the Court on Defendant Lockheed Martin Training Solutions, Inc.'s ("LMTSI") Motion for Summary Judgment (Doc. 83). Having reviewed the submissions of the parties and the relevant law, the Court finds that Defendant's motion should be _DENIED in part and GRANTED in part._

**Summary of Relevant Facts**

Plaintiff began working for Defendant February 26, 1996 as a maintenance technician. Since 2006, the maintenance technicians employed by Defendant are unionized by the International Association of Machinists and Aerospace Workers, Local 794, and Plaintiff is a member of that union.  All maintenance technicians rotate between the day, evening and mid (sometimes called the "graveyard") shifts every four months.  Defendant company has an unwritten policy of "letting the employees have some say in what rotation they [are] working" by taking volunteers for certain shifts and the like.  Doc. 84-8, p. 4; Doc. 88-5, p. 2; Doc. 88-6, 2.

On November 30, 2005, Plaintiff verbally told a Human Resources Professional that he had been diagnosed with Attention Deficit Disorder ("ADD") when he was serving in the U.S. Military.  Plaintiff did not request any formal accommodations for his ADD when he reported the diagnosis, and subsequently he has not requested any formal accommodation. Nevertheless

Defendant, via its human resources department, sent Plaintiff a letter requiring him to submit to a psychological examination and threatening to fire Plaintiff if he failed to do so.  Doc 84-1, p. 21.  Plaintiff did not attend the examination.  Defendant rescheduled the examination and sent another letter to Plaintiff dated May 3, 2006.  84-1, p. 22.  Plaintiff did not attend the rescheduled examination, but instead hired an attorney to challenge Defendant's psychological examination requirement.  Ultimately, Plaintiff did not submit to the exam and was not fired.

Over a year later, in October of 2007, Plaintiff's supervisor, James Hutchinson, told Plaintiff that he had received complaints about Plaintiff and Darren Martini, both of whom were then working the day shift.  Mr. Hutchinson approached the two men and asked one of them to "volunteer" to switch to the graveyard shift, though it was not yet time for the 4-month shift rotation.  Plaintiff had already volunteered to work the graveyard shift earlier in the year.  Neither Plaintiff nor Mr. Martini volunteered, so Mr. Hutchinson chose Plaintiff to change shifts.  Plaintiff was notified on October 19, 2007 that he was to begin working the graveyard shift October 29.  This occurred in the middle of the regular shift rotation period, but Defendant complied with the labor union's Collective Bargaining Agreement ("CBA") by giving Plaintiff more than a week's notice of the change.

Plaintiff opposed being reassigned to the mid-shift, and he complained to his supervisors and his union that he was being unfairly singled out. Mr. Hutchinson told Plaintiff that he was moved to the graveyard shift because of complaints about his and Mr. Martini's work on the day shift, and because Defendant needed a technician with Plaintiff's level of experience–a "tech III"–on the graveyard shift.  When Plaintiff repeatedly requested the specific elements of his work that needed improving, Defendant would not name specific errors but placed him "on a Performance Improvement Plan ("PIP") on December 4, 2007 to ensure that he understood what

was required of him on the mid shift." Doc. 84, p.5. The PIP listed Plaintiff's general work duties but did not specify the areas where he had been remiss. Doc 88-4, p1; Doc. 88-12.

Then, on December 6, 2007, Casey Juntunen, one of Plaintiff's colleagues on the midshift, complained that Plaintiff was mischarging his time by leaving work orders open longer than it took to complete the work. Ethics officers from out of state investigated Plaintiff for mischarging time. The investigators concluded that Plaintiff mischarged his time by logging work hours when he was using the internet for personal use and conducting other non-work business. Doc 88-4, p. 4. Defendant terminated Plaintiff April 1, 2008 for mischarging time.

Plaintiff filed a grievance with his union after being terminated, and he also filed a charge of employment discrimination with the EEOC. The union represented him in the grievance process with Defendant. After more than a year of negotiations, Plaintiff, his union, and Defendant signed a Last Chance Agreement ("LCA")**,** which allowed Plaintiff to return to work with full seniority. Doc. 88-9. In addition, the EEOC issued him a right to sue letter for his employment discrimination claim against Defendant. Doc. 88-11. Plaintiff did indeed return to work for Defendant on May 18, 2009, and he continues to work there today.

On July 27, 2009, Plaintiff filed an action in the Second Judicial District Court for the State of New Mexico alleging employment discrimination on the basis of age and perceived disability by Defendant. Defendant removed the action to this Court. Doc. 1.

## Jurisdiction

The Court has jurisdiction over the suit pursuant to 42 U.S.C. § 1332 ("diversity jurisdiction").

## Standard of Review

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Medina v. Income Support Div.*, 413 F.3d 1131, 1133 (10th Cir. 2005) (quoting Fed. R. Civ. P. 56©). In response, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co.* v. *Zenith*, 475 U.S. 574, 587-88 (1986). To avoid summary judgment, the nonmoving party may not rest upon the mere allegations in the pleadings but must show, at a minimum, an inference of the existence of each essential element of the case. *Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1016-17 (10th Cir. 2001) (citing *Hulsey v. K-Mart, Inc.*, 43 F.3d 555, 557 (10th Cir. 1994)). When viewing the evidence, the Court must draw reasonable inferences in favor of the non-moving party. *Matsushita*, 475 U.S. at 587.

Summary judgment is not ordinarily appropriate for settling issues of intent or motivation. *Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526**,** 530 (10th Cir. 1994).  To the extent that discrimination cases turn on the defendant's intent or motivation, "summary judgment should seldom be used in employment-discrimination cases."  *Smith v. St. Louis University*, 109 F.3d 1261, 1264 (8th Cir. 1997); *cf. O'Shea v. Yellow Technology Services, Inc.*, 185 F.3d 1093, 1098 (10th Cir. 1999) (observing that evaluation of employment discrimination claim elements like "severity" and "pervasiveness" is particularly unsuited for summary judgment because it is "quintessentially a question of fact").  When employment discrimination cases do reach the summary judgement stage, the standards for summary judgment are applied "with added rigor . . . where intent and credibility are crucial issues."  *Courtney v. Biosound, Inc.*, 42 F.3d 414, 418 (7th Cir. 1994) (internal quotations omitted).

**Discussion**

**I.      Age Discrimination**

Plaintiff alleges that "Defendant violated the New Mexico Human Rights Act

("NMHRA") by taking adverse employment actions against Plaintiff on the basis of his age."

Doc. 1-2, p.4.  The *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) framework applies

to claims under the New Mexico Human Rights Act . *Ruby v. Sandia Corp*., 699 F.Supp.2d

1247, 1266 (D.N.M. 2010).  "Under *McDonnell Douglas Corp. v. Green*, the plaintiff first bears

the burden of establishing a prima-facie case of age discrimination, which is established when the

plaintiff proves the following elements: (i) the plaintiff is a member of the protected age

class-persons who are forty years old or older; (ii) the plaintiff was qualified to continue in his or

her position of employment; (iii) the plaintiff's employment was terminated; and (iv) someone not

a member of the protected age class filled the plaintiff's position." *Id*.; *Cates v. Regents of New

Mexico Institute of Min. & Technology*, 954 P.2d 65, 70 (1998).

Element (iii) could also be satisfied if the plaintiff showed another form of adverse

employment action that amounted to a "significant change in employment status..." *Jones v.

Oklahoma City Public Schools*, 617 F.3d 1273, 1279 (10th Cir. 2010) (quoting *Hillig v. Rumsfeld*,

381 F.3d 1028, 1032-33 (10th Cir. 2004).  "The Tenth Circuit liberally defines the phrase

'adverse employment action.' Such actions are not simply limited to monetary losses in the form

of wages or benefits. Instead, [it] take[s] a 'case-by-case approach,' examining the unique factors

relevant to the situation at hand." *Id*. (internal citations omitted).  However, shift changes or job

reassignments that do not result in "any decrease in compensation, job title, level of

responsibility, or opportunity for promotion" generally are not considered 'adverse' in the context

of employment discrimination.  45A Am. Jur. 2d § 237.  In short, "an adverse employment action

must be materially adverse to the employee's job status." *Fischer v. Forestwood Co., Inc.*, 525 F.3d 972, 979 (10th Cir. 2008) (internal quotations omitted).

Under these standards, Defendant's termination of Plaintiff certainly amounts to an 'adverse employment action.' The off-schedule shift change and the PIP, though, are not as obviously adverse. Given that Plaintiff's termination by Defendant satisfies the adverse employment element of these discrimination claims, the Court need not reach at this time the fact-intensive decision as to whether the shift-change and PIP were also adverse employment actions under the law.

Defendant argues that Plaintiff has not established a prima facie case of age discrimination, because he was terminated for mischarging time and therefore was not qualified to continue his employment when the alleged discriminatory acts occurred. Doc. 84, p. 10. However, Defendant confuses Plaintiff's initial burden to establish the prima facie element of "qualification" with its own subsequent burden to provide a legitimate business reason for its employment actions. As to the former, "a plaintiff may make out a prima facie case of discrimination in a discharge case by credible evidence that [he] continued to possess the objective qualifications [he] held when [he] was hired, or by [his] own testimony that [his] work was satisfactory, even when disputed by [his] employer, or by evidence that [he] had held [his] position for a significant period of time." *Mattera v. Gambro, Inc.*, 94 Fed.Appx. 725, 728 (10th Cir. 2004) (unpublished case) (quoting *MacDonald v. E. Wyo. Mental Health Ctr.*, 941 F.2d 1115, 1121 (10th Cir.1991)). "Thus, the employer's subjective reasons are not properly considered at the prima facie stage, and should instead be considered in addressing whether those articulated reasons are legitimate or merely a pretext for discrimination." *Id*. (quoting *Thomas v. Denny's, Inc*., 111 F.3d 1506, 1510 (10th Cir.1997)).

Plaintiff worked at defendant company for over twelve years before being terminated in 2008. He was rehired, and he continues to work there today[1]. Those two facts alone are sufficient to establish that Plaintiff was qualified for his position as required to make a prima facie claim of employment discrimination. *See id.* Defendant's argument that the mischarging offense disqualified Plaintiff for employment will be addressed with its other proffered business reasons for taking adverse employment actions against Plaintiff.

Viewing the evidence in the light most favorable to Plaintiff, as the Court must at this stage, Plaintiff has established that he was qualified to continue his employment with Defendant and therefore established element (ii) of his prima facie case of employment discrimination. Defendant does not dispute that Plaintiff has established the remaining three elements of the prima facie claim. Thus, Plaintiff has established a prima facie case of age discrimination as required by the *McDonnel Douglas* framework.

After establishing a prima-facie case for age discrimination, "the burden shifts to the defendant to come forward with a legitimate nondiscriminatory reason for its employment related decision." *Ruby*, 699 F.Supp.2d at 1266 (quoting *McDonnell Douglas*, 411 U.S. at 802). Defendant has presented two such reasons for disciplining and terminating Plaintiff: 1.) His poor work performance was the reason for moving him to the midshift in the middle of a rotation period and for placing him on a Performance Improvement Plan ("PIP"); 2.) His act of mischarging time was a terminable offense.

 Since Defendant has articulated legitimate, nondiscriminatory, business reasons for its actions against Plaintiff, the burden of proof shifts once more to Plaintiff. *Id.* Plaintiff now "must present evidence that the defendant's proffered reason for the employment decision was *pretextual*." *Id.* (emphasis added). "The evidence which a plaintiff can present in an attempt to

---

[1] He maintains the same level of seniority as he did before the termination.

7

establish that a defendant's stated reasons are pretextual may take a variety of forms." *Kendrick v. Penske Transp. Services, Inc*., 220 F.3d 1220, 1230 (10th Cir. 2000) (internal quotations omitted). "A plaintiff may not be forced to pursue any particular means of demonstrating that a defendant's stated reasons are pretextual." *Id*.  "A plaintiff could show pretext by presenting evidence either that a discriminatory reason more likely motivated the employer or that the employer's proffered explanation is unworthy of credence." *Rea v. Martin Marietta Corp*., 29 F.3d 1450, 1455 (10th Cir. 1994) (quoting *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 256, (1981)). Plaintiff could also show pretext "with evidence that the defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision affecting [him]." *Kendrick*, 220 F.3d at 1230 (internal quotations omitted).  "If a plaintiff presents evidence that the defendant's proffered reason for the employment decision was pretextual-i.e. unworthy of belief, the plaintiff can withstand a summary judgment motion and is entitled to go to trial." *Id*.  Moreover, "it is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation." *Reeves v. Sanderson Plumbing Products, Inc*. 530 U.S. 133, 147 (2000).

In regard to the change of shift[2], Plaintiff argues that Defendant's proffered business motivations were pretextual.  He states that the two reasons for the shift change–the need to discipline Plaintiff for poor performance and the need for a technician with advanced skill and experience on the midshift–are inconsistent with each other and therefore "unworthy of credence."  The inconsistency is made more glaring by Mr. Hutchinson's statement to Plaintiff that he was being moved to the graveyard shift to be "trained."  Doc 88-4, p. 3.

---

[2]As noted above, the off-rotation shift change may or may not qualify as an 'adverse employment action' in this case.  The Court addresses the parties' arguments regarding the shift change without deciding whether it constitutes an adverse employment action.

Plaintiff also presented evidence that Defendant usually had only one tech III on the midshift, but Defendant added Plaintiff as the second tech III on that shift.  Doc. 88-6, p.3. Finally, Plaintiff demonstrated that Defendant had an unwritten policy of giving employees a say in their shift changes and allowing employees to volunteer for particular shifts rather than forcing them.  Doc. 84-8, p. 4; Doc. 88-5, p. 2; Doc. 88-6, 2.  Moving Plaintiff to the midshift against his will and off-schedule after he had already volunteered for that shift earlier in the year could be found to violate the unwritten policy regarding shift assignment.  *See id.*

Defendant, in its reply, did not address or explain the anomalies Plaintiff presented. Instead, it engaged in ad hominem attacks on Plaintiff and Plaintiff's deposed witnesses, calling their depositions, given under oath, as "self-serving" and "wishful thinking."[3]  Doc. 92, p. 3. Defendant did not, for example, explain why it needed to transfer an experienced technician to the midshift in the *middle* of the scheduled shift rotation, rather than doing so at the previous or subsequent rotation.  Defendant also did not explain why it chose an employee being disciplined for poor performance to fill a leadership position on a different shift, or why a second tech III was needed on the midshift when usually only one was required.  There may well be good answers to these conundrums, but such answers are not present in the record.  A jury could find that Defendant's reasons for moving Plaintiff to the midshift were pretextual based on the evidence Plaintiff has presented and the lack of explanation provided by Defendant.

---

[3] Defendant's moving papers in this case are fraught with glib, non-legal attacks on Plaintiff and his witnesses.  The Court does not find such remarks informative or appropriate. Rather than bolster its case, such remarks undermine Defendant's position and its credibility.

Next, Plaintiff claims that Defendant's reason for placing him on the PIP was pretextual[4]. Defendant states that it placed Plaintiff on the PIP "to ensure the he understood what was required of him on the midshift." Doc. 84, p.5. However, it did not instate the PIP until more than six weeks *after* placing Plaintiff on the midshift. Moreover, the PIP did not include specific areas for Plaintiff to improve, but simply restated his job description for the midshift. Doc. 88-12. Plaintiff's colleague Mr. Martini was also placed on a PIP following the performance complaints, but Mr. Martini wrote in a sworn affidavit that Mr. Hutchinson told him "that he was putting [Mr. Martini] on a performance improvement plan so that it would not appear that [Defendant] was targeting [Plaintiff]." Doc. 88-7, p.2. Mr. Hutchinson also told Plaintiff that he was being placed on PIP " because [Plaintiff] went off site with [his] complaint about being put on mid shift." Doc. 88-4, p. 1. Based on the evidence presented by Plaintiff, a jury could find that Defendant's proffered business reason for placing Plaintiff on PIP was pretextual.

Finally, Plaintiff claims that Defendant's non-discriminatory reason for firing him was pretextual. Defendant and Plaintiff agree that Plaintiff officially was terminated for mischarging work hours. Plaintiff, however, alleges that the finding of mischarging was based largely on his personal internet usage at work. In a letter to the EEOC, Defendant's counsel (not counsel in this suit) wrote that the mischarged time "was recorded in the ethics investigation as being 'due to non-work computer activity such as surfing the internet.'" Doc 88-4, p. 4. Defendant failed to explain how the mischarging was *not* related to personal internet use. And since there were at least five other employees who used the internet more than Plaintiff (Doc. 88-6), Plaintiff states the final determination of mischarging was pretextual. Doc. 88, p. 14.

---

[4] As noted above, the PIP may or may not qualify as an 'adverse employment action' in this case. The Court addresses the parties' arguments regarding the PIP without deciding whether it constitutes an adverse employment action.

The record contains evidence that other employees who were surfing the internet for non-work purposes while on the company clock, i.e., employees who were mischarging time in the same way Plaintiff had been mischarging time, were not terminated.  Doc. 84-6, p. 8; Doc. 88-6, pp. 4-6.  (In fact, the person who fingered Plaintiff for mischarging time, Mr. Juntunen, was "neck and neck" with Plaintiff for personal computer usage while at work.  Doc 88-6, p. 5.)  Since those individuals were not terminated, it follows that one could still be qualified for employment though one had committed the offense of mischarging.  *See Garcia-Montoya v. State Treasurer's Office*, 16 P.3d 1084, 1100 (2001) (observing that another plaintiff showed pretext for termination where employer did not discipline or terminate other employees for committing the same or more serious infractions).

Plaintiff also presented evidence that the person who first accused him of mischarging, Mr. Juntunen, had a personal animus against him.  Doc. 88-5, p.5; Doc. 88-6, p. 6.  When Defendant reorganized its maintenance technicians, Plaintiff retained his level of seniority while Mr. Juntunen was demoted to tech-I.  Doc. 88-5, p. 5.  Mr. Hutchinson, supervisor of both Plaintiff and Mr. Juntunen, even said that "you have to take [Mr. Juntunen's complaints] with a grain of salt."  *Id.*  Rather than viewing Mr. Juntunen's complaint with a grain of salt, Defendant initiated a formal ethics investigation of mischarging against Plaintiff.  What's more, when Defendant reviewed personal internet use among all its employees, Mr. Juntunen was "neck and neck" with Plaintiff.  Doc 88-6, p. 5.  Viewing these facts in the light most favorable to Plaintiff, it is possible that a jury could find that Defendant's reason for firing Plaintiff–mischarging time–was pretextual or unworthy of belief.

Plaintiff also alleges that Defendant's real motivation was age discrimination, not Defendant's proffered business reasons for the employment actions.  Specifically, he alleges that "the motivating factor in Defendant's decision to move Plaintiff to the mid-shift, place Plaintiff

on performance improvement plans, and terminate Plaintiff" was his age.  Doc. 1-2, p. 7.  Mr. Juntunen was in his early twenties–decades younger than Plaintiff.  (Mr. Juntunen was also two seniority levels below Plaintiff.)  Additionally, one of the allegations against Plaintiff concerned his personal use of the internet while at work.  However, once Defendant complied with the union's request to investigate all employees' use of the internet, it discovered that Plaintiff was not even in the top five for internet use at work.  Doc. 88-6, p.5.  Defendant did not terminate those with higher usage, though it did discipline and ultimately terminate Plaintiff.  *Id.*  Plaintiff alleges that at least some of the individuals in the 'top five' of internet use were younger than he, and Defendant did not dispute or disprove that allegation with, for example, a list of the employees and their dates of birth[5].  The list of employees and their personal internet usage remains in the control of Defendant, so it has the burden to produce such information.

Taking all of the information above in the light most favorable to Plaintiff, there are multiple scenarios under which a jury could find that Defendant's proffered business reasons for its employment actions against Plaintiff were pretextual or unworthy of belief.  Thus, there is a material question of fact as to Defendant's intent and motivation in taking adverse employment actions against Plaintiff.  Plaintiff's Count I against Defendant, wherein he alleges employment discrimination based on age, will not be dismissed.

## II.    Perceived Disability

Plaintiff also alleges that "Defendant violated the New Mexico Human rights Act . . . by taking adverse employment actions against Plaintiff on the basis of his perceived disability."  Doc. 1-2, p. 8.  As noted above, the *McDonnell Douglas* framework applies to discrimination claims under the New Mexico Human Rights Act ("NMHRA").  *Ruby*, 699 F.Supp.2d at 1266.

---

[5] Defendant is not limited to that particular piece of evidence, but Defendant provided *no* evidence to dispute Plaintiff's assertion that the individuals in the 'top five' were younger than he.

Courts also may follow the guidance of other federal laws when interpreting discrimination claims under the NMHRA.  *See Trujillo v. Northern Rio Arriba Elec. Co-op, Inc*., 41 P.3d 333, 338 (2001).  For disability discrimination claims, "the closest federal counterpart [to the NMHRA] would be the Americans with Disabilities Act, 42 U.S.C. §§ 12101-12213 (1994) ("ADA"), a federal statute prohibiting discrimination against persons with a disability." *Id.*

"To establish a prima facie case of disability discrimination under the ADA or NMHRA, Plaintiff must show that [he] is disabled." *Keller v. Board of Educ. of City of Albuquerque, N.M.*, 182 F.Supp.2d 1148, 1154-1155 (D.N.M. 2001) (citing *Morgan v. Hilti, Inc*., 108 F.3d 1319, 1323 (10th Cir.1997)); *Kitchell v. PNM*, 972 P.2d 344, 346 (1998).  Plaintiff must also show that he "is qualified, with or without reasonable accommodation, to perform the essential functions of the job held or desired," and that he "suffered discrimination by an employer . . . *because of* that disability."  *Kellogg v. Energy Safety Services Inc*., 544 F.3d 1121, 1124 (10th Cir. 2008) (emphasis added).

A. Disability

"A person is regarded as disabled when '(1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities.'" *Lanman v. Johnson County, Kansas*, 393 F.3d 1151, 1156 (10th Cir. 2004) (quoting *Sutton v. United Air Lines, Inc*., 527 U.S. 471, 489 (1999)).  "In creating this category of disability, Congress recognized that society's accumulated myths and fears about disability and disease are as handicapping as are the physical limitations that flow from actual impairment." *Id*. (internal quotations omitted).  Since Plaintiff asserts that he does not have any actual impairments from his ADD, "to survive summary judgment [he] must establish that a genuine factual issue exists regarding whether [Defendant] (1) mistakenly perceived [him]

13

as being impaired, and (2) mistakenly believed the perceived impairment substantially limited at least one major life activity."  *Id*. at 1156-57.

"Working is a major life activity" as defined by the ADA.  *Id*. at 1157; *Rakity v. Dillon Cos., Inc.*, 302 F.3d 1152, 1158 (10th Cir. 2002); 29 C.F.R. § 1630.2(I).  Working is also listed as a major life activity in the NMHRA.  28-1-2(N) NMSA 1978.  Defendant took certain actions that could suggest that it believed Plaintiff's ADD substantially limited his ability to work.  Specifically, Defendant's HR representative, Ms. Foster, "sent a letter to Plaintiff on March 7, 2006 requiring him to participate in a psychological evaluation *to determine his fitness to perform his duties* at [Defendant company]."  Doc 84, p. 15 (emphasis added).  The letter also stated that "failure to participate in the evaluation could result in termination of employment."  *Id*.  When Plaintiff did not submit to the examination, Defendant sent a second letter, with the same demand and threat of termination.  *Id*.  The letters indicate that Defendant believed Plaintiff's ADD limited his ability to work.  *Contra Lanman*, 393 F.3d at 1157 (employer's demand that employee submit to a medical exam did *not* indicate that employer perceived employee to have a disability, where employer presented legitimate business reason for exam and employee "suddenly became involved in several troubling incidents affecting co-workers").

Employers may order a medical exam or similar when it is "shown to be job-related and consistent with business necessity."  42 U.S.C. § 12112(d)(4)(A).  However, Defendant has not provided in its moving papers for this case a business-related reason for ordering Plaintiff to submit to a psychological exam[6].  Defendant's silence as to its motivation for demanding the psychological evaluation undermines its ostensible defense that it had a legitimate business

_____

[6] Plaintiff did not request a formal accommodation, and Defendant did not present evidence that Plaintiff was remiss in his work duties when he disclosed the ADD diagnosis.  So, the obvious business-reasons for ordering a psychological evaluation do not apply in this case.  More information is needed for the Court to infer that Defendant had a legitimate reason to order the psychological evaluation.

reason for demanding the evaluation.  Based on the information in the record, a genuine factual

issue exists regarding whether Defendant mistakenly perceived Plaintiff as being impaired and

mistakenly believed the perceived impairment substantially limited the major life activity of

working.  Plaintiff has established the first element of his prima facie perceived disability

discrimination claim.

B. Qualified for Employment

As discussed on pages 6 and 7 *supra*, Plaintiff has presented sufficient evidence for the

Court to find, for purposes of this motion, that he is qualified for employment in his current

position with Defendant.  He has thereby established the second element of a prima facie case of

perceived disability discrimination.

C. Causality

Defendant argues that "there is an insufficient relationship in time between Plaintiff's

November 2005 disclosure of ADD and the employment action [i.e., his termination] taken two

years later."  Doc. 84, p. 19.  "Temporal proximity," or the relationship in time between an

employee's act and the employer's adverse employment action, is *one* way to establish the

causation element of a prima facie claim of retaliation under the NMHRA.  *See, e.g.*, *Juneau v.

Intel Corp*., 127 P.3d 548, 552 (2005).  Here, Plaintiff does not attempt to establish the causality

element by showing temporal proximity, so the temporal proximity of his disclosure of ADD and

Defendant's act of firing him is not dispositive.  *Cf. id*. (noting that plaintiffs may rely on

temporal proximity to establish causality element when no other evidence is available).

However, Plaintiff did not provide any other evidence that tied Defendant's belief that he

was disabled to its adverse action of terminating his employment.  He reiterated his arguments

from Count I, but those were related to *age* discrimination.  Plaintiff did not provide any

additional information that indicated Defendant was still considering his 2005 ADD diagnosis

15

disclosure when it moved him to the midshift October 2007, when it placed him on the PIP December 2007, or when it fired him April, 2008.  The information in the record indicates that Defendant did not mention or otherwise bring up Plaintiff's ADD diagnosis after Plaintiff's attorney sent it a cease-and-desist type letter dated May 11, 2006.  Doc 88-2.

Since more than a year passed between the ADD letters and the following adverse employment action, Plaintiff must provide more evidence than temporal proximity to support his claim.  *See MacKenzie v. City and County of Denver*, 414 F.3d 1266, 1280 (10th Cir. 2005) (noting past precedent that three months between events was too long a lapse to qualify for temporal proximity showing of pretext and requiring additional evidence to establish prima facie claim).  Plaintiff has not established the causality element of his prima facie claim of disability discrimination, and so Count II of his complaint cannot survive Defendant's motion for summary judgment.

## III.    Retaliation

The NMHRA, Section 28-1-7(I)(2), declares it an unlawful discriminatory practice for "any person or employer to . . . engage in any form of threats, reprisal or discrimination against any person who has opposed any unlawful discriminatory practice or has filed a complaint . . . under the Human Rights Act."  "To establish a prima facie case of retaliation, Plaintiff must show that (1) he engaged in protected activity, (2) he was subject to adverse employment action subsequent to, or contemporaneous with the protected activity, and (3) a causal connection exists between the protected activity and the adverse employment action."  *Juneau*, P.3d at 552.

A. Protected Activity

Plaintiff asserts that his e-mail complaints to Defendant's HR Department, wherein he alleges that he was being "singled out" and was suffering from unfair treatment, were protected activity under the NMHRA.  Doc. 88, p. 17.  However, e-mails or complaints that allege unfair

16

treatment are not protected under the NMHRA unless they specifically allege prohibited conduct under the NMHRA–in this case, acts of age discrimination. *Hinds v. Sprint/United Management Co.*, 523 F.3d 1187, 1203 (10 Cir. 2008). "Although no magic words are required, to qualify as protected opposition the employee must convey to the employer his or her concern that the employer has engaged in a practice made unlawful by" law such as the NMHRA. *Id.* "A vague reference to discrimination and harassment without any indication that this misconduct was motivated by [a protected class] does not constitute protected activity and will not support a retaliation claim." *Anderson v. Academy School Dist. 20*, 122 Fed.Appx. 912, 916 (10 Cir. 2004). *See also Ashkin v. Time Warner Cable Corp.*, 52 F.3d 140, 143-44 (7th Cir.1995) (concluding that a complaint about management style, which does not mention unlawful harassment or discrimination, is not protected opposition).

Plaintiff's e-mails clearly allege misconduct by other employees of Defendant. However, Plaintiff did not mention age discrimination–not even obliquely. The primary concern of those e-mails is that Mr. Hutchinson, his supervisor, did not explain in detail where Plaintiff's performance needed improving. Such complaints do not support a retaliation claim. *Academy School Dist. 20*, 122 Fed.Appx. at 916. Since Plaintiff has not shown the protected activity for which he was retaliated against, his retaliation claim does not survive Defendant's motion for summary judgment.

## IV.    Damages

As part of his age discrimination claim, Plaintiff pleads damages resulting from the shift-change, PIP, and termination by Defendant. However, Defendant argues that Plaintiff has not suffered any damages from the shift-change or PIP, and that Plaintiff waived claim to the termination damages when he signed the LCA and returned to work. The LCA contains a provision that the period during which Plaintiff was not employed by Defendant, April 2008 to

17

May 2009, would be an "unpaid disciplinary suspension." Doc. 88-9. Plaintiff acknowledges
that the LCA contains that provision, but he argues that the LCA does not waive or preclude
recovery for discrimination claims.

"Common law [contractual] waiver is an 'intentional relinquishment or abandonment of a
known right.'" *In re Salopek*, 107 P.3d 1, 3 (2004) (quoting *J.R. Hale Contracting Co. v. United
N.M. Bank*, 799 P.2d 581, 585 (1990)). Waiver of employment discrimination claims must be
knowing and voluntary. *Torrez v. Public Service Co. of New Mexico, Inc.*, 908 F.2d 687**,** 689
(10th Cir. 1990). **"**Waivers of federal remedial rights . . . are not lightly to be inferred." *Id*.
When the waiver is a product of a general release or contract, courts in the Tenth Circuit look
beyond the language of the written document and consider the totality of circumstances. *Id*.
"Especially in light of the strong policy concerns to eradicate discrimination in employment, a
review of the totality of the circumstances, considerate of the particular individual who has
executed the release, is also necessary." *Id.*, *(*quoting *Conventry v. U.S. Steel Corp*., 856 F.2d
514, 522-523 (3rd Cir.1988)).

Here, the language of the LCA is clear that, by signing the agreement, Plaintiff agreed that
the period during which he was unemployed would be considered unpaid disciplinary time. Doc.
88-9. However, the LCA never refers to a waiver of rights, a waiver of discrimination claims, or
a waiver of back pay. *See* Doc. 88-9. Plaintiff claims that his subjective understanding of the
LCA was that it did not bar claims for employment discrimination or back pay. Doc 88, p. 22.
So, the Court is left with a fact-based inquiry as to whether Plaintiff did waive his rights to lost
wages when he signed the LCA. The Court need not conduct such a fact-intensive inquiry at this
time. At the summary judgment stage, it is sufficient for the court to find that there is a material
question of fact as to whether Plaintiff waived his right to back pay or to damages resulting from
unemployment when he signed the LCA.

18

Plaintiff has also claimed damages from emotional distress during the fourteen months he was unemployed.  His emotional distress damages are only one part of the total amount of damages he seeks in this suit.  He did not bring a separate tort claim for intentional infliction of emotional distress.  Therefore, Defendant's arguments regarding the tort of intentional infliction of emotional distress[7] are not relevant to this suit.  Under New Mexico law, mental pain and aguish are legally compensable items of damages.  *Rutledge v. Johnson*, 465 P.2d 274, 277 (1970).  Thus, Plaintiff has properly alleged damages in this suit, and no further analysis is required from the Court at this stage in the proceedings.

## V.     Motion to Strike Portions of Plaintiff's Affidavit

In addition to its multiple motions for summary judgment, Defendant also filed a Motion to Strike Portions of Plaintiff's Affidavit (Doc. 91) in an effort to remove statements contained in Plaintiff's affidavit in opposition to summary judgment (Doc. 88-3).  Specifically, Defendant seeks to remove statements contained in paragraphs 9-12, 15, and 18 of Plaintiff's affidavit–statements Defendant alleges are not based on Plaintiff's personal knowledge and are not admissible in court pursuant to the Federal Rules of Evidence and the Federal Rules of Civil Procedure.

Defendant correctly notes that an affidavit opposing summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(e)(1).  However, "at the summary judgment stage, evidence need not be submitted 'in a form that would be admissible at trial.'"  *Argo v. Blue Cross and Blue Shield of Kansas, Inc*., 452 F.3d 1193, 1199 (10 Cir. 2006)

---

[7] In the section of its brief concerning Plaintiff's claimed damages for emotional distress, Defendant cites *Dominguez v. Stone*, 638 P.2d 423 (N.M. App. 1981), *Trujillo v. Northern Rio Arriba Elec. Co-op, Inc*., 41 P.3d 333 (N.M. 2001), and *Gudenkauf v. Stauffer Communications*, Inc., 922 F.Supp. 461(D.Kan. 1996) in support of its arguments.  Since all three concern tort claims for intentional infliction of emotional distress, they are irrelevant to this suit.

(quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).  For example, "parties may. . . submit affidavits in [in opposition to] summary judgment, despite the fact that affidavits are often inadmissible at trial as hearsay, on the theory that the evidence may ultimately be presented at trial in an admissible form." *Id.* (citing *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1122 (10th Cir.2005)).  "Nonetheless, 'the content or substance of the evidence must be admissible.'" *Id.* (quoting *Thomas v. Int'l Bus. Machs.*, 48 F.3d 478, 485 (10th Cir.1995)).

The Court was able to evaluate the instant Motion for Summary Judgment without relying on the affidavit in question, so the Motion to Strike has been rendered moot.  It is worth noting, though, that the affidavit did contain facts that would be admissible at trial–though not necessarily in the form of Plaintiff's affidavit.  Every paragraph adheres to the provisions of   Fed. R. Civ. P. 56(e)(1).

### Conclusion

Pursuant to the foregoing, the motion for summary judgment will be *DENIED in part and GRANTED in part*.  Defendant's motion to Strike Portion of Plaintiff's Affidavit will be *DENIED*.  The challenged portions of Plaintiff's affidavit will not be struck.

### O R D E R

*For the above stated reasons, the Court hereby DENIES Count I of Defendant's motion for summary judgement (Doc. 83) and DENIES Defendant's motion to strike (Doc. 91).*

Dated this 3rd day of March, 2011.

_____
BRUCE D. BLACK
UNITED STATES DISTRICT JUDGE